COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT

NORFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
650 High Street, Dedham, MA 02026
CIVIL ACTION NO. 2282CV00987

SUNPATH FUNDING, LLC,
     Plaintiff

v.

VEHICLE PROTECTION SPECIALISTS LLC
and DANIEL LAURENT a/k/a DANIEL
MICHAEL LAURENT
     Defendant

**VERIFIED COMPLAINT**

## PARTIES

1. The Plaintiff, SunPath Funding, LLC, is a foreign limited liability company having a usual place of business at 50 Braintree Hill Park, Suite 310, Braintree, Norfolk County, Massachusetts 02184.

2. The Defendant, Vehicle Protection Specialists LLC ("VPS"), is a Nevada limited liability company having a usual place of at 6789 Quail Highway 605, Irvine, California 92603.

3. The Defendant, Daniel Laurent a/k/a Daniel Michael Laurent ("Laurent"), is an individual residing at 9 MacArthur Place, Unit 2202, Santa Ana, California 92707.

## JURSIDICTION AND VENUE

4. This Court has jurisdiction over this civil action for money damages in excess of $50,000.00 pursuant to M.G.L.C c. 212, § 3.

5. This Court is the appropriate venue as the Plaintiff has a usual place of business in Braintree, Massachusetts.

6. The Defendant has consented and submitted to the jurisdiction and venue of this Court pursuant to paragraph 16 of the Seller Agreement appended hereto as Exhibit "A."

## COUNT I
### Breach of Contract
### vs Vehicle Protection Specialists LLC

7. The Plaintiff reasserts and incorporates herein each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

8. On or about March 4, 2016, a Seller Agreement ("Agreement") was executed by the Laurent as CEO for VPS for the sale of vehicle service contracts. A copy of the Agreement is attached hereto and marked as Exhibit "A".

9. VPS has defaulted on the Agreement and has failed to make further payments in accordance with the terms of the Agreement.

10. After all payments and/or credits have been adjusted on this account, there remains a balance due and owing to the Plaintiff by VPS in the amount of ONE MILLION TWO HUNDRED TWENTY-FIVE THOUSAND ONE HUNDRED THREE AND 00/100 ($1,225,103.00) DOLLARS. See Exhibit "B."

11. VPS has breached its obligations due to the Plaintiff and became liable and bound to pay the amount owed to the Plaintiff, but said Defendant has failed to pay the Plaintiff in full, and therefore, now owes the Plaintiff the sum of ONE MILLION TWO HUNDRED FIFTY-THREE THOUSAND ONE HUNDRED FORTY-THREE AND 54/100 ($1,253,143.54) DOLLARS, which includes interest at a rate of 1.25% per month (15% per annum) from February 18, 2021, default date, through the date of Complaint, in the amount of TWENTY-FOUR THOUSAND FORTY AND 54/100 ($24,040.54) DOLLARS and attorney=s fees currently estimated at FOUR THOUSAND AND 00/100 ($4,000.00) DOLLARS.

12. **WHEREFORE,** the Plaintiff demands a money judgment against the Defendant, Vehicle Protection Specialists LLC, plus continuing interest, costs, and attorney's fees.

## COUNT II
## Personal Guaranty
## vs. Daniel Laurent a/k/a Daniel Michael Laurent

13. The Plaintiff reasserts and incorporates herein each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

14. On or about March 4, 2016, Laurent executed a Personal Guaranty whereby he guaranteed the debt of VPS. A copy of the Personal Guaranty is attached hereto and marked as Exhibit "A."

15. Laurent has failed to make any further payments leaving a balance due to the Plaintiff from said Defendant in the amount of ONE MILLION TWO HUNDRED TWENTY-FIVE THOUSAND ONE HUNDRED THREE AND 00/100 ($1,225,103.00) DOLLARS. See Exhibit "B.

16. Laurent has breached his obligations with the Plaintiff, and became liable and bound to pay the amount owed to the Plaintiff but said Defendant has failed to pay the Plaintiff in full, and therefore, now owes the Plaintiff the sum of ONE MILLION TWO HUNDRED FIFTY-THREE THOUSAND ONE HUNDRED FORTY-THREE AND 54/100 ($1,253,143.54) DOLLARS, which includes interest at a rate of 1.25% per month (15% per annum) from February 18, 2021, default date, through the date of Complaint, in the amount of TWENTY-FOUR THOUSAND FORTY AND 54/100 ($24,040.54) DOLLARS and attorney=s fees currently estimated at FOUR THOUSAND AND 00/100 ($4,000.00) DOLLARS.

**WHEREFORE,** the Plaintiff demands a money judgment against the Defendant, Daniel Laurent a/k/a Daniel Michael Laurent, plus continuing interest, costs, and attorneys fees.

## VERIFICATION

The foregoing facts are stated on our own personal knowledge, information and belief and, insofar as they are based upon information and belief, we believe them to be true.

**SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 5th DAY OF OCTOBER, 2022.**

SunPath Funding, LLC

By: _____
Andrew Garcia
Its: Authorized Officer


The Plaintiff, SunPath Funding, LLC,
by its Counsel

_____
Jonathan H. Allen, Esq.  BBO#638033
Allen Law, P.C.
1500 Main Street, Suite 1506
P.O. Box 15567
Springfield, MA 01115
Tel. (413) 645-5080
Fax (413) 645-5084
Email: jon@allenlawma.com
Date: 10-17-22

## SELLER AGREEMENT

This Seller Agreement (this "Agreement") is made and entered into on March 4th, 2016 (the "Effective Date") by and between Vehicle Protection Specialists, LLC ("Seller"); and SunPath Funding, LLC, a Delaware limited liability company ("SPF"); and each guarantor signatory hereto (each, a "Guarantor").

WHEREAS, Seller sells vehicle service contracts ("Contracts") as an agent for a third party provider or administrator (the "Administrator"), which Contracts provide for the payment or reimbursement of costs for the repair and replacement of certain parts in vehicles owned or leased by purchasers of Contracts ("Purchasers"). Obligations of Administrator under the Contracts are secured by an insurance policy (the "Policy") from an insurance company or other party ("Insurer"), which Policy insures the performance or payment by the obligor under a Contract should the obligor be unable to perform or pay;

WHEREAS, Administrator (i) desires to provide a payment plan program for Purchasers to pay the aggregate sales price of a Contract on an installment basis, and (ii) pursuant to a separate agreement between Administrator and Seller (the "Admin-Seller Agreement"), allows the Seller to charge a mark-up over the Administrator cost in connection with each Contract sold, which mark-up is not fully earned until completion of the Contract coverage term (the "Seller Mark-Up");

WHEREAS, SPF administers, services and maintains an installment payment plan program (the "Payment Plan Program"); and

WHEREAS, Seller desires to participate in the Payment Plan Program and SPF is, under certain circumstances, willing to permit Seller to participate in the Payment Plan Program and provide installment payment arrangements for Purchasers of Contracts for the benefit of Seller and Administrator under the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Certain Definitions.** As used herein, the following terms shall have the meanings specified below. Additional terms are defined parenthetically throughout this Agreement.

    A. "Accepted Contract" means a Contract that the Seller tenders to SPF for inclusion in the Payment Plan Program and that SPF subsequently accepts for inclusion in the Payment Plan Program.
    B. "Account" means the account of any Purchaser that has entered into a Payment Plan Agreement with SPF.
    C. "Advance Amount," means, with respect to any Contract, the Advance Rate multiplied by (a) the fully accelerated Seller Mark-Up permitted to be retained by the Seller, less (b) the amount of the Down Payment (as defined below), and less (c) the Discount Amount (as defined below).
    D. "Advance Conditions" means, with respect to any Contract, that Purchaser (a) has paid to Seller the down payment due under the Payment Plan Program (the "Down Payment"), and (b) the first installment due under the Payment Plan Program has been paid by the applicable Purchaser to SPF at least 10 days prior.
    E. "Advance Rate" means a percentage, and shall initially mean the percentage set forth on the attached Terms Schedule (the "Terms Schedule"), which percentage may be modified by SPF, in its sole discretion, from time to time for any reason (including, without limitation, in situations where SPF deems itself insecure).
    F. "Amount Financed" means the Sales Price (as defined below) less the Down Payment.
    G. "Cancellation Refund" means, with respect to any Accepted Contract, (a) the Amount Financed, plus (b) any late payment charges, NSF charges, chargeback amounts and related chargeback fees, and any other bank-related fees and/or penalties due to SPF, less (c) any payments received by SPF from the applicable Purchaser on account of such Accepted Contract (but only to the extent not required to be returned to such Purchaser at any time), less (d) any payment received by SPF from Administrator within 60 days of the cancellation of the Accepted Contract on account of the cancellation of the Accepted Contract, and less (e) any Discount Amount Adjustment.
    H. "CRM Provider" means Moxy, Forte Data Systems and any other vendor who provides Seller with software or services for customer relations management (including, without limitation sales activities, marketing, customer service, and technical support, or the generation of agreements between customers and Seller).
    I. "Discount Amount" means, with respect to any Contract, the fee due to SPF upon acceptance of the Contract into the Payment Plan Program as set forth in the Terms Schedule.
    J. "Discount Amount Adjustment" means, with respect to any cancelled Accepted Contract, the Discount Amount less the earned discount upon cancellation set forth in the Terms Schedule.
    K. "Down Payment" means, with respect to any Contract, the amount paid by the Purchaser to Seller at the time of sale of the Contract.
    L. "Excess Payments" shall mean (a) the Unadvanced Amount, less (b) any unpaid Cancellation Refunds (including all deferred Cancellation Refunds, regardless of whether SPF has demanded payment of such deferred Cancellation Refunds) and other unpaid Seller Obligations (as defined below), and less (c) any payment or credit previously made to Seller as an advance towards Excess Payments.
    M. "Reserve" means an amount, estimated by SPF at its sole discretion as (a) the sum of the Unadvanced Amounts for all uncancelled Accepted Contracts for which the Advance Conditions have been met, less (b) the sum of all deferred Cancellation Refunds for any Accepted Contract that has been cancelled, less (c) any other Seller Obligation that has not been paid by Seller. Seller agrees that the Reserve is an accounting construct that SPF uses to monitor deferred obligations of the Seller and possible future payments by Purchasers, and as such Seller agrees that the Reserve is not and may not be construed as an asset of Seller or a liability of SPF.
    N. "Sales Price" means the fully accelerated payments, including the Down Payment, due from a Purchaser if an Accepted Contract is not cancelled.
    O. "Seller Obligations" means Seller's obligations under this Agreement or any other agreement between SPF and the Seller, including without limitation, the Seller's obligations to pay Cancellation Refunds or any other amounts to SPF.
    P. "Unadvanced Amount" means, with respect to any Accepted Contract, (a) the Seller Mark-Up for such Accepted Contract, less (b) the Discount Amount, less (c) the amount of the Down Payment, and less (d) Advance Amount

2. **Accounts and Documentation.** From time to time, Seller will tender Contracts to SPF for inclusion in the Payment Plan Program. For each Accepted Contract, Seller shall deliver to SPF electronic copies of the originals of Purchaser's payment plan agreement as well as any other documents requested or required by SPF. Unless otherwise stipulated by SPF, electronic files must be delivered in conformity with this Agreement and

SPF's standard operating procedures. Seller shall maintain duplicate originals of all documents in connection with each Accepted Contract and shall immediately deliver such duplicate originals to SPF upon SPF's request. SPF may, in its sole discretion and for any reason, refuse to accept any account or Contract or include any Contract in the Payment Plan Program, and SPF shall not, under any set of circumstances or under any theory of liability, be liable to Seller or any other party on account of any such decision by SPF.

3. *Discount Amount.* SPF shall receive the Discount Amount for each Accepted Contract. The Discount Amount will be calculated based on the stated term of the Accepted Contract, the Amount Financed, and such other factors as SPF may specify. SPF may change the amount or manner of calculation of the Discount Amount from time to time at its sole discretion, and such changes will take effect upon notice to Seller. Until and unless Seller receives such notice, the Discount Amount shall be calculated as set forth in the Terms Schedule.

4. *Advances to Seller.* Except as otherwise set forth in the Terms Schedule, following SPF's receipt and acceptance of an executed copy of the required documents with respect to an Accepted Contract and the account associated with such Accepted Contract, SPF shall, following the satisfaction of all Advance Conditions, advance to Seller an amount equal to the Advance Amount. SPF shall be entitled to recoup or offset any and all Seller Obligations from any and all amounts which would otherwise be advanced by SPF to Seller hereunder.

5. Cancellation Refunds; Letter of Credit or Collateral Account.

   A. *Cancellation Refunds Generally.* If a Purchaser or SPF requests that an Accepted Contract be cancelled, or an Accepted Contract is cancelled for any other reason, Seller shall, no later than 5 days following the date of such cancellation, immediately refund to SPF the Cancellation Refund. In addition, rather than requiring Seller to make a separate payment of its Cancellation Refund, SPF may, at its sole discretion, subtract the Cancellation Refund, or any part thereof, from the amount that would otherwise be advanced to Seller hereunder. Notwithstanding the foregoing, SPF may, at its sole discretion and on a case-by-case basis, allow Seller to defer payment of the Cancellation Refund, however any such deferred Cancellation Refund shall be due and payable no later than 5 days following request of SPF. SPF will not, under any circumstance, allow Seller to defer payment of the Cancellation Refund when the Reserve has a zero or negative value.

   B. *Letter of Credit; Collateral Account.* Seller acknowledges that SPF may, on or prior to the Effective Date, require Seller to (a) purchase an irrevocable $_____ letter of credit ("Letter of Credit") in a form acceptable to SPF and issued by a financial institution acceptable to SPF, or (b) establish a cash collateral account ("Collateral Account") in favor of SPF, with a financial institution (the "Collateral Account Bank") and pursuant to an account control agreement (the "Control Agreement"), acceptable to SPF in its sole discretion. In any case, Seller will take all actions, including execution of the Control Agreement, reasonably required by SPF to give SPF security required in its sole discretion, including a perfected security interest in the funds held in the Collateral Account and to prevent any payments out of any such account without SPF's prior, written consent. The Collateral Account or Letter of Credit will remain outstanding, effective and, except as set forth below, unmodified, at all times during the term of this Agreement and following the term of this Agreement so long as any Seller Obligations remain outstanding. Seller hereby agrees and acknowledges that: (i) in the event SPF initiates a draw against the Letter of Credit or instructs the Collateral Account Bank to disburse funds to SPF at any time and for any reason, Seller shall (unless such requirement is otherwise waived in writing by SPF) be responsible for immediately having the Collateral Account or Letter of Credit funded or reissued, as the case may be, in the full amount of the Collateral Account balance or face amount, as applicable, as of immediately prior to such disbursement or draw (such amount, at the outset, to be $_____); and (ii) in the event there are more than _____ Accepted Contracts within any calendar month during the term of this Agreement, the face amount of the Letter of Credit or the minimum balance required in the Collateral Account may, at SPF's option, be increased to the level deemed necessary by SPF.

   C. *Failure to Pay Cancellation Refund.* If SPF has not received the full amount of any Cancellation Refund, other refund or any other amount due from Seller hereunder within 10 days following the date of cancellation of any Accepted Contract or the date such payment is otherwise due, (i) Seller, regardless of the level of the Reserve, hereby authorizes SPF to initiate a draw against the Letter of Credit or require a disbursement out of the Collateral Account, as applicable, for the full amount owing, and (ii) to the extent any further amounts remain owing to SPF, Seller hereby authorizes the applicable Administrator, upon notice from SPF and with no further action required by any other party, to remit such amounts directly to SPF out of any funds due from such Administrator to Seller (and Seller hereby releases such Administrator from and against any and all liabilities or damages which might arise out of any such payment directly to SPF). In addition to the foregoing, in the event Seller lowers the Sales Price under any Accepted Contract after the applicable Advance Amount has been advanced, Seller will immediately remit to SPF the amount by which such Sales Price was lowered.

6. *Excess Payments.* Excess Payments shall not be remitted by SPF to Seller or to any third party to which Seller may be indebted or otherwise liable until SPF has determined, as set forth herein and in its discretion, that Seller has fully, finally and irrevocably satisfied all direct and contingent obligations to SPF hereunder or otherwise (including, without limitation, the payment of all Cancellation Refunds and other Seller Obligations). Seller acknowledges that the amount of the Excess Payments to be remitted to Seller, if any, cannot be calculated until such time as all Cancellation Refunds and other Seller Obligations have been fully and finally satisfied.

7. *Affirmative Covenants of Seller.* During the Term (as herein defined), Seller shall:

   (i) follow all Payment Plan Program policies and procedures with respect to all Accepted Contracts included in the Payment Plan Program;

   (ii) ensure that Purchasers (a) are not offered different pricing on Accepted Contracts based on their decision to pay a lump sum for the Accepted Contract versus participating in the Payment Plan Program, and (b) are not charged any interest or finance fees, or any other amounts intended to disguise any interest or finance fee charges;

   (iii) upon execution of an Accepted Contract, collect the Down Payment from the applicable Purchaser and report to SPF, in each and every instance, the precise amount of the Down Payment actually collected by Seller;

   (iv) maintain adequate reserves to pay any and all Cancellation Refunds, any potential Purchaser refunds and any other amounts which may become due and owing hereunder from time to time;

   (v) in the event an Accepted Contract is cancelled for any reason, promptly refund to the applicable Purchaser the full amount due and owing to such Purchaser (Seller being solely and fully responsible for the payment of such refund) and, to the extent Seller receives any refunds from the applicable Administrator, immediately remit such amount to the applicable Purchaser;

   (vi) ensure that each Accepted Contract is genuine, evidences an undisputed bona fide transaction, is not subject to any right of set-off or counterclaim, has a coverage term of at least 24 months and relates only to new or used automobiles, marine vehicles, RVs, motorcycles or trucks;

(vii) upon request of SPF, provide financial, entity and equity holder information (including, without limitation, audited financial statements or other financial information prepared by an independent certified public accountant acceptable to SPF);

(viii) comply with all Federal Trade Commission policies and all applicable laws in soliciting and/or entering into Purchaser accounts and Contracts (which includes, without limitation, providing adequate notices and disclosures);

(ix) be solely responsible for compliance with the Federal Electronic Funds Transfer Act, Federal Reserve Regulation E and any similar local or state laws (collectively, the "EFT Laws") with respect to the transfer of funds between Purchaser and Administrator, Seller or SPF by pre-authorized draft or direct debit, which includes (a) with respect to any pre-authorized draft or direct debit, causing the Purchaser to authorize such pre-authorized draft or direct debit in accordance with EFT Laws, and (b) upon SPF's request, promptly providing copies to SPF of all records evidencing such authorizations (it being understood that if this subsection constitutes a delegation of duties required by any EFT Law by SPF to Seller, Seller hereby accepts such delegation and agrees to be fully responsible for the performance of all such duties, as if it were primarily responsible under the EFT Laws);

(x) comply with all best practices policies and/or statements which are published from time to time by the Vehicle Protection Association ("VPA") and/or any other vehicle service trade group or oversight body;

(xi) ensure that no Accepted Contract is subject to any prior assignment by Seller, claim, lien or security interest against Seller (and Seller will not make any assignment thereof or create any security interest therein, nor permit the same to become subject to any attachment, levy, garnishment, or other judicial process);

(xii) promptly notify SPF in writing in the event Seller is or becomes subject to an inquiry or investigation by any local, state or Federal government or regulatory agency, any consumer or professional association or the VPA;

(xiii) provide advance, written disclosure to SPF of Seller's intent to use any third party dialing services;

(xiv) read to all Purchasers and potential Purchasers the sale disclosure script recommended by SPF or the VPA from time to time at the end of all marketing and/or sales telephone calls (which script shall be recorded and made accessible to SPF and Administrator);

(xv) provide, through any CRM Provider, together with each submission of a Contract for inclusion in the Payment Plan Program, data detailing the source of the lead by which such Contract was generated (which data shall also be available to the applicable Administrator);

(xvi) promptly comply with and/or resolve all complaints, requests for information, or other documents filed with or by any local, state or Federal government or regulatory agency, any consumer or professional association or the VPA, a Purchaser or any other third party (collectively, "Third Party Complaints") (it being understood that if SPF determines, in SPF's sole discretion, that Seller has not complied with this requirement, SPF may immediately cancel any Accepted Contract(s) related to such Third Party Complaint); and

(xvii) provide the Letter of Credit or Collateral Account in the initial face amount or account balance amount of $_____ to support repayment of Advance Amounts owed to SPF, and to maintain the Letter of Credit or Collateral Account at such amount or such increased amount as may be required by SPF from time to time as described above.

8. **Negative Covenants of Seller:** During the Term, Seller shall refrain from:

(i) using any form or agreement in connection with Accepted Contracts offered pursuant to the Payment Plan Program that has not been supplied or approved by SPF in writing;

(ii) soliciting offers from financing companies or lending institutions to finance or obtain financing with respect to any Contract which has been offered to SPF, until such time as SPF has provided Seller with written notice of SPF's refusal to accept such Contract as provided herein;

(iii) selling, either directly or through an affiliated or unaffiliated entity, a new vehicle service contract to any Purchaser within 180 days of the cancellation of such Purchaser's Accepted Contract (except to the extent such new contract becomes part of the Payment Plan Program), or selling any list of Purchasers to a third party without SPF's prior, written consent;

(iv) granting or allowing a lien, security interest, mortgage or encumbrance of any kind upon any portion of the Collateral (as herein defined) or otherwise pledging or permitting to be granted any interest of any kind whatsoever in any Accepted Contract;

(v) except for amounts owing to SPF, issuing, incurring, assuming, creating or otherwise having outstanding any indebtedness for borrowed money without the prior written consent of SPF;

(vi) following the occurrence of an Event of Default (as herein defined), declaring or paying any dividend or distribution to any equity holder of Seller, or repurchasing any equity owned by any equity holder of Seller without, in each case, the prior, written consent of SPF;

(vii) except as may be reflected in the terms of any particular Accepted Contract, entering into any written or oral agreement with any Purchaser for any discount or deduction with respect to any Accepted Contract except to the extent that Seller provides advance written notice to SPF of such discount or deduction and immediately remits to SPF the amount by which the applicable Advance Amount would have been decreased had such discount or deduction been taken into account in calculating such Advance Amount;

(viii) engaging, either directly or by working with any third party, in "voice blasting" or "robo-calling" (it being understood that (1) a single violation of this clause (a "Voice-Blasting Breach") shall constitute a material breach of this Agreement, and (2) any violation of this clause by any third party with which Seller works or has a business relationship (or any of any such party's agents) shall also constitute a material breach by Seller of this Agreement);

(ix) engaging in any form of telemarketing which violates the Telephone Consumer Protection Act of 1991, the Telemarketing Consumer Fraud and Abuse Prevention Act, any Federal Trade Commission rule, order or regulation, any state telemarketing or consumer fraud statute, or any other applicable Federal, state or local law or regulation (it being understood any breach of this clause by any third party with which Seller works or has a business relationship (or any of any such party's agents) will constitute a material breach of this Agreement by Seller); or

(x) following the occurrence of an Event of Default, taking any action intended to hinder or prevent any payment of any amounts due to SPF, including, without limitation, the cancellation of Accepted Contracts.

9. **Term/Termination.** This Agreement shall commence as of the Effective Date and continue until terminated by either party for any reason upon written notice to the other party (the "Term"). Seller shall, upon any termination of this Agreement, continue to be obligated to comply with all of the requirements set forth herein in respect of each Accepted Contract including, without limitation, affirmative and negative covenants. In particular, and not in limitation of the foregoing, Seller shall, following termination of this Agreement for any reason, refrain from (i) selling, or seeking to sell, Seller's "book" of Accepted Contracts to a third party, or (ii) taking any action intended to cause any Purchaser to cancel any Accepted Contract following termination of this Agreement. This Section 9 shall survive the expiration or termination of this Agreement for any reason, and (x) Seller shall indemnify SPF in full for any damages or expenses suffered by SPF on account of Seller's breach of this Section, and (y) SPF shall, in addition to any other remedies it may have hereunder or at law, be entitled to enforce this Section by injunction in the event of any breach or threatened breach of this Section 9 by Seller.

10. **Representations and Warranties.** Seller hereby represents and warrants to SPF that: (i) this Agreement has been validly executed and delivered by Seller and constitutes a valid and binding obligation of Seller; (ii) there are, as of the date hereof, no liens or security interests on any portion of the Collateral; (iii) all financial statements, accounts receivable summaries, capitalization tables and other materials provided to SPF prior to the date hereof are true and correct in all material respects and do not fail to state any material facts regarding Seller, (iv) Seller maintains internal procedures and controls to comply with all applicable laws and to promptly resolve all Third Party Complaints; (v) Seller is duly organized in its state of formation and is in good standing under the laws of its state of formation and all other states where it is required to be in good standing; (vi) Seller has all necessary licenses, approvals and other authority to carry out its business in accordance with all applicable laws, policies and regulations; (vii) except as otherwise disclosed to SPF in writing, Seller has not, at any time within the past 5 years, received any notice from the Federal Trade Commission, any attorney general, any state's attorney or any other governmental authority or oversight authority alleging that Seller is not or was not in compliance with applicable rules, laws, ethical standards or policies; (viii) Seller is not insolvent within the meaning of 11 U.S.C. § 101(32); (ix) the execution of this Agreement by Seller will not (a) result in a breach of any contract to which Seller is a party or by which its assets are bound, (b) result in the creation or imposition of any liens in favor of any third person or entity upon any of Seller's assets, or (c) render Seller insolvent within the meaning of 11 U.S.C. § 101(32); (x) Seller has notified SPF in writing of all "doing-business-as" names it currently uses; (xi) Seller does not engage in "voice-blasting" or "robo-dialing" practices; (xii) Seller is in compliance with all applicable laws; (xiii) Seller is not a party to any litigation or arbitration proceeding as of the date of this Agreement, and no such action has, to the knowledge of Seller, been threatened against Seller; and (xiv) Seller is not aware of any other circumstances which would be reasonably likely to cause a material adverse effect to Seller's business or the value or condition of the Collateral.

11. **Events of Default.** The occurrence of any one or more of the following events shall constitute an event of default hereunder (each, an "Event of Default"): (i) Seller fails to pay any amount due to SPF including, without limitation, any Cancellation Refund, within 5 days of the date when due; (ii) any representation or warranty set forth herein shall be untrue when made or shall become untrue or inaccurate at any time during the Term; (iii) Seller defaults under any other material agreement or contract to which it is a party; (iv) Seller makes an assignment for the benefit of creditors; (v) proceedings in bankruptcy or for reorganization of Seller or for the readjustment of any of its debts under the bankruptcy law, as amended, or under any other act or law, whether state or federal, now or hereafter existing, for the relief of debtors, shall either be commenced involuntarily against or filed by Seller; (vi) proceedings seeking appointment of a receiver, trustee, custodian, conservator or similar official for Seller or for all or any substantial part of its assets, under any existing or future law of any jurisdiction, shall either be commenced involuntarily against or filed by Seller; (vii) Seller becomes insolvent within the meaning of 11 U.S.C. § 101(32) or otherwise is unable to timely satisfy its debts, payables and/or obligations as they become due; (viii) Seller breaches any provision, covenant or obligation set forth in this Agreement and fails to cure such breach within 15 days of receipt of notice of such breach; (ix) SPF deems itself insecure for any reason whatsoever with regard to the Seller's fulfillment of its obligations under this Agreement or any other agreement between SPF and the Seller, including without limitation, the Seller's obligations to pay Cancellation Refunds or any other Seller Obligations; (x) the occurrence of any material adverse change in Seller's business, Seller's financial situation, Seller's net worth, Seller's risk profile or Seller's prospects (as determined by SPF in its sole discretion); or (xi) Seller otherwise fails to fulfill any of the Seller Obligations on a timely basis. Seller hereby agrees and acknowledges that it is fully responsible for all actions taken by parties it has engaged or with which it otherwise works in performing services under this Agreement or marketing Contracts, and as such, any action taken by any such party in violation of this Agreement shall constitute a breach of this Agreement by Seller.

12. **Certain Remedies.**

A. *Events of Default.* Upon the occurrence of an Event of Default, in addition to any other remedies SPF may have at law, equity and/or under this Agreement, (i) SPF may continue to determine the Advance Rate at its discretion, recoup or offset any and all Seller Obligations from any and all amounts which may otherwise be advanced by SPF to Seller and refuse to accept any Contracts in the Payment Plan Program, (ii) until 6 months have elapsed from the date on which all Contracts are paid in full and/or cancelled, all associated accounts receivable have been paid in full, all Purchasers have received any refunds due and owing to them and SPF has received all Cancellation Refunds, other refunds and other amounts due and owing to SPF under this Agreement or any other agreement between SPF and the Seller, SPF shall not be required to pay any Excess Payments, and (iii) SPF shall be entitled to receive, directly from Administrator, any and all payments due from Administrator to Seller with respect to all Accepted Contracts sold by Seller that are administered by Administrator.

B. *Cessation of Operations.* Upon the occurrence of a Cessation Event (as defined below), SPF shall be entitled (including, without limitation, immediately upon the occurrence of a Voice-Blasting Breach), pursuant to the Power of Attorney attached hereto as Exhibit 12, to notify Seller's telephone provider(s) to transfer and/or forward any and all telephone numbers of Seller to SPF or a third party agent designated by SPF (and Seller will provide whatever assistance SPF deems necessary to allow SPF to take control over such telephone numbers and transfer them to SPF or any such third party). For purposes of this Agreement, "Cessation Event" shall mean the earlier to occur of (i) a VPA attorney determining in writing that Seller has ceased all sales activities, or (ii) a determination in writing that Seller has ceased all sales activities from Administrator(s) responsible for at least 50% of the Accepted Contracts sold by Seller during the calendar month immediately preceding the month in which such written notice is provided.

C. *Amounts Due From Administrator and Producer Owned Reinsurance Companies.* Seller hereby acknowledges that from time to time Seller or a producer owned reinsurance company identified in the Terms Schedule (each, a "PORC") may be entitled to receive funds from Administrator with respect to reinsurance earned premiums or retro earned premiums (the "Earned Premiums"). Seller shall notify SPF in writing of any new PORCs with which it establishes a relationship following the date hereof or, to the extent tied in any way to Seller's production hereunder, of any new PORCs with which any of Seller's subsidiaries or affiliated entities establishes a relationship following the date hereof (the "PORC Notification Requirement"). In the event that any amounts are due from Seller to SPF or upon the occurrence of an Event of Default, SPF shall have the right, which right shall be senior to any rights of Seller or any other third party, to directly receive any such Earned Premiums in order to set off against any Seller Obligations. Seller hereby acknowledges and agrees that SPF may instruct Administrator to pay such Earned Premiums to SPF, and Seller hereby directs Administrator to (i) pay such Earned Premiums directly to SPF upon receipt of such instruction from SPF

Page 4 of 10

with respect to the Earned Premiums, and (ii) provide to SPF any information related to the applicable PORC that may be requested by SPF from time to time. Under any set of circumstances, no amount shall be paid by any PORC to Seller (including, without limitation, any Earned Premium), without SPF's prior, written consent. Seller shall, no later than 5 business days from the date of this Agreement, cause the administrator of each PORC to acknowledge, and to agree to adhere to, this Section 12(C) in writing.

D. *Past Due Amounts; Remedies.* All amounts due and owing to SPF upon the occurrence of an Event of Default, and/or any amounts due hereunder which remain unpaid for 30 days after they become due to SPF shall accrue interest daily at the rate of 1.25% per month (or, if less, the highest allowable state maximum rate). Notwithstanding anything to the contrary contained in this Section, all of the remedies set forth above in this Section 12 and elsewhere in this Agreement are cumulative and do not exclude SPF's exercising any other rights or remedies provided at law or in equity. Seller shall be responsible for all costs incurred by SPF, including attorneys' fees, in collecting any such past due amounts from Seller.

E. *Non-Circumvention.* The parties hereby acknowledge that any action taken, or omitted to be taken, by any of Seller's equity holders or officers which would, had such action instead been taken by Seller, constitute a breach of this Agreement or Event of Default, shall be deemed to constitute an Event of Default hereunder.

13. *Security Interest; Collateral.* To secure Seller's full and timely performance of all of the Seller Obligations hereunder, including, without limitation, the full and timely payment of all Cancellation Refunds and other amounts owing by Seller to SPF hereunder, Seller hereby grants to SPF a continuing security interest and first lien in and to all of Seller's equipment, accounts, inventory, goods, documents, general intangibles, software, instruments, investment property and all proceeds of the foregoing (collectively, the "Collateral"). SPF shall be entitled to perform UCC and related searches against Seller and/or its officers and owners (at Seller's expense) and to create and file any and all UCC financing statements and/or take other actions necessary to perfect, and maintain perfected, such security interest. If an Event of Default has occurred, SPF may, as a secured party, exercise, in addition to all other rights and remedies granted to SPF in this Agreement and in any other instrument or agreement relating to this Agreement, all rights and remedies of a secured party under the Uniform Commercial Code, as amended from time to time. The sole duty of SPF with respect to any Collateral, under the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as SPF deals with similar property for its own account and to the extent permitted by applicable law. Seller waives all claims, damages and demands it may acquire against SPF arising out of the exercise by SPF of any of its rights hereunder. Seller hereby irrevocably constitutes and appoints SPF and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Seller and in the name of Seller or in its own name, from time to time in SPF's sole discretion, for the purpose of carrying out the terms of this Section, to take any and all appropriate action and to execute any and all instruments which may be necessary or desirable to accomplish the purposes of this Section, and, without limiting the generality of the foregoing, Seller hereby gives SPF the power and right, on behalf of Seller, without notice to or assent by Seller, to do the following: (i) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to SPF or as SPF shall direct; (ii) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (iii) to sign and endorse any invoices, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (iv) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other rights in respect of any Collateral; (v) to defend any suit, action or proceeding brought against Seller with respect to any Collateral; (vi) to settle, compromise or adjust any suit, action or proceeding described in clause (v) above and, in connection therewith, to give such discharges or releases as SPF may deem appropriate; and (vii) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though SPF were the absolute owner thereof for all purposes. Neither SPF nor any of its directors, managers, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Seller or otherwise.

14. *Indemnity.* Seller hereby agrees to defend, indemnify and hold SPF and its owners, members, directors, managers, officers, employees and agents harmless from and against any and all claims, actions, demands, losses, damages, costs, liabilities, claims or other charges, absolute or contingent, matured or unmatured, known or unknown and any and all expenses incurred (including, but not limited to, attorneys' fees and court costs) by such party in connection with or arising out of (i) Seller's breach of this Agreement or breach or alleged breach of any Accepted Contract, (ii) any act or omission of Seller in connection with any Accepted Contract or any other aspect of Seller's Business, (iii) any action, suit or proceeding by a third party relating to the subject matter of this Agreement, or (iv) any cancellation of any Accepted Contract by a Purchaser, Seller, Administrator or SPF. Notwithstanding the foregoing, if applicable law prohibits indemnification for gross negligence or willful misconduct, SPF shall not be entitled to indemnification for claims arising out of conduct for which indemnification is not permitted. In addition, and without limiting the foregoing, Seller shall reimburse SPF for all costs and expenses arising out of or relating to any claim initiated against Seller by a Purchaser or any other party, including, without limitation, court costs and reasonable attorneys' and paralegals' fees and expenses incurred on account of attending depositions and/or responding to subpoenas.

15. *Guaranty.* Each Guarantor individually, hereby unconditionally, absolutely, and irrevocably guaranties (i) the full and prompt payment to SPF, whether by acceleration or otherwise, of all amounts due to SPF by Seller pursuant to this Agreement including, without limitation, all Seller Obligations, and (ii) the prompt and full performance and discharge by Seller of the terms, conditions, agreements, representations and warranties of Seller contained in this Agreement or in any modification or amendment thereto, plus all expenses (including court costs and reasonable attorneys' and paralegals' fees), paid or incurred by SPF in endeavoring to enforce or collect any amount due to SPF under this Agreement (collectively, the "Guaranteed Obligations"). Upon the occurrence of an Event of Default, all of the Guaranteed Obligations then existing shall, at the option of SPF, immediately become due and payable from each Guarantor. Each Guarantor hereby acknowledges that SPF may proceed against Seller and/or such Guarantor jointly or severally, in any order, as determined by SPF in its sole discretion. Each Guarantor hereby agrees and acknowledges that this guaranty is a guaranty of performance and not of collection. Each Guarantor hereby expressly waives all presentment for payment, demand and/or notice, as to any and everyone, of protest, default or nonpayment, and notice of the creation and existence of any and all of the Guaranteed Obligations, and of any security therefor, or of any other matters or things whatsoever relating to this Agreement. Each Guarantor submits himself or herself to the jurisdiction of any local, state or federal court located within Norfolk County, Massachusetts and agrees to the other provisions of this Section 15. Each Guarantor shall provide SPF with annual personal financial statements within 30 days of the end of each calendar year during the term of this Agreement, and a copy of such Guarantor's federal income tax return within 15 days of the date of filing. Each Guarantor hereby represents, warrants and covenants that no other entity or business in which Guarantor holds an equity interest currently engages, or at any time in the future will engage, in any form of outbound consumer solicitation that uses automated messages, "voice blasting" or "robo-calls," whether directly or through any license or other arrangement with any third party provider or vendor.

16. *Governing Law; Interpretation.* This Agreement shall be construed in conformity with the laws of the Commonwealth of Massachusetts without regard to choice of law or conflict of law rules. The parties hereto irrevocably agree that all actions or proceedings in any way, manner or respect, arising out of or from or related to this Agreement, shall be brought only in courts having situs within the Commonwealth of Massachusetts. Each party hereby consents and submits to the jurisdiction of any local, state or federal court located within the Commonwealth of Massachusetts and waives any right it may have to transfer the venue of any such action or proceeding. It is the intent of the parties that this Agreement be deemed to have been prepared by all of the parties and that no party shall be entitled to the benefit of any favorable interpretation or construction of any term or provision hereof

under any rule or law.

17. **Protection of Confidential Information; Authorization.** Each party recognizes that the other party has and will continue to develop certain trade secrets, know-how, records, manuals, correspondence, documents, financial and sales information, reports, customer lists, policies, procedures, proposals, marketing plans, ideas, concepts, services and any other proprietary information which is confidential (collectively "Confidential Information"). Each party agrees that, upon the termination of this Agreement, such party will immediately deliver to the other all papers, books, manuals, lists, correspondence, documents and materials relating to the other party's Confidential Information, together with all copies and embodiments of all of the foregoing including, without limitation, electronically stored records, databases, programs, computer disks and computer software. Each party further agrees that such party will not at any time reveal any Confidential Information of the other party to any other person or otherwise use the Confidential Information of the other party for any purpose other than as specifically set forth herein. It is understood that Confidential Information does not include any information that is publicly available through no fault of the receiving party. Notwithstanding anything set forth above, SPF shall be entitled to (i) provide customer payment information, funding information regarding Seller and other related information to any software vendor and/or licensor from which Seller licenses or otherwise has use of software related to the administration of the Accepted Contracts and/or Purchasers, (ii) perform full background and credit checks on Seller, each of Seller's officers and each equity holder of Seller (which authorization shall extend to any individuals who become officers and/or equity holders of Seller following the date hereof), (iii) provide information regarding Seller to any Administrator as deemed necessary by SPF (including information regarding Events of Default), and (iv) report Events of Default and other Seller infractions hereunder to the VPA. In addition, Seller hereby agrees, pursuant to this Section 18 and the Consent attached hereto as Exhibit 37, that (i) SPF shall be entitled to receive from any CRM Provider any and all reporting information regarding Accepted Contracts which may be in such CRM Provider's possession from time to time, and (ii) each CRM Provider shall be entitled to rely on this Section 17, without any further action on the part of Seller and without the need for any further consent from Seller, and no CRM Provider shall be liable in any way on account of providing any information regarding Seller to SPF.

18. **Severability.** Whenever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law; but if any provision hereof or the application thereof to any party or circumstance is prohibited by or invalid under applicable law, such provision shall be effective only to the minimal extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions hereof or the application of such provisions to other parties or circumstances.

19. **Disclaimer; Consequential Damages.** Except as explicitly set forth in this Agreement, SPF does not make any warranties of any kind, either expressed or implied, including, without limitation, (a) warranties of merchantability or fitness for a particular purpose, (b) that its services hereunder will meet Seller's requirements, (c) that SPF will include any Contract in the Payment Plan Program, or (d) as to the results that Seller may achieve on account of the relationship created hereby. Finally and notwithstanding any other provision in this Agreement, in no event shall SPF have any liability to Seller for any loss of data, lost profits, costs of procurement of substitute goods or services, or any other special, indirect, punitive, incidental, exemplary or consequential damages (whether direct or indirect), whether based in contract, tort (including negligence) or any other theory of liability, even if SPF has been advised of the possibility of such damages. In addition, Seller hereby agrees and acknowledges that SPF is not liable to Seller in any way or in any amount on account of any damages and/or losses suffered by Seller, or alleged to be suffered by Seller, on account of any action taken prior to the date hereof by SPF, and SPF shall have no liability to Seller on account of any prior or future decisions regarding the Advance Rate, offsets or inclusion of a Contract within the Payment Plan Program. Under any set of circumstances, SPF's aggregate liability to Seller hereunder or otherwise shall be limited to $1,000.

20. **Certain Acknowledgments.** Seller hereby agrees and acknowledges that: (1) the Seller Mark-Up is earned by the Seller from the Administrator rather than SPF, as Seller is not providing any services to, for or on behalf of SPF; (2) SPF's advance of a portion of the Seller Mark-Up as described herein is an accommodation to the Administrator; (3) all amounts due and owing by a Purchaser under any Accepted Contract (other than the Down Payment, to which Seller has rights only on account of the assignment of such rights by the Administrator) are and will be payable solely to SPF (and to the extent any such payments are deemed to be payable to Seller for any reason, Seller hereby fully and finally assigns all rights to such payments to SPF); (4) SPF shall not, under any set of circumstances, be liable to Seller or any third party on account of any damages arising out of SPF's election to (i) exclude any or all Contracts submitted by Seller, (ii) decrease the Advance Rate as deemed necessary by SPF (including to 0%), or (iii) terminate this Agreement, regardless of reason; (5) SPF's decision to decrease the Advance Rate at any time will apply to all Accepted Contracts with respect to which SPF has not yet advanced the Advance Amount to Seller; and (6) SPF is not responsible in any way for ensuring that Seller remains solvent, and SPF shall not be liable to Seller or any third party for any claim alleging that SPF's decision regarding any Contract, Accepted Contract and/or the Advance Rate caused Seller to become insolvent or otherwise caused Seller to cease business operations.

21. **Non-Solicitation.** Seller hereby agrees that during the term of this Agreement and for a period of 2 years thereafter, it will not, either directly or indirectly, solicit or hire any employees or contractors of SPF, as well as any former employees or contractors who were employed or engaged by SPF at any time during the term of this Agreement.

22. **Successors.** This Agreement and all of the terms and provisions hereof shall be binding upon and shall inure to the benefit of the parties, their respective legal representatives, heirs, successors or assigns.

23. **Entire Agreement.** This Agreement contains the entire understanding among the parties and supersedes any prior understandings and/or written or oral agreements among them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter hereof that are not fully expressed herein.

24. **Fees and Costs; Taxes.** In the event of any claim or dispute arising out of this Agreement, the party that substantially prevails shall be awarded, in addition to all other relief, all attorneys' fees and other costs and expenses incurred in connection with the claim or dispute, including without limitation those fees, costs and expenses incurred before, during or after suit, in any arbitration, in any appeal, in any proceedings under any present or future bankruptcy act or state receivership, and in any post-judgment proceedings. Seller shall be responsible for the payment of all taxes due and owing in connection with the relationship created by this Agreement (other than SPF's income taxes).

25. **Notices.** Any notices, offers, acceptances and other communications required hereunder shall be in writing and deemed to have been given and received (i) when personally delivered or upon transmission of a facsimile (with confirmation of transmission), (ii) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery, or (iii) 3 days after being mailed by United States certified mail, return receipt requested, postage prepaid, to the parties at their respective addresses as set forth below or at such other address as such party may designate by notice hereunder.

26. **Assignment.** No party may assign its rights or delegate any duties under this Agreement without the express prior written consent of the other parties; provided, however, that SPF and its permitted assignees may pledge some or all of its rights hereunder and any documents, instruments or agreements arising therefrom or related thereto, including assigning such rights, documents, instruments and agreements to any third party that provides financing to SPF.

27. **Pronouns and Headings.** As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction. The headings, titles, and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

28. **Survival of Rights.** Except as otherwise specifically provided to the contrary in this Agreement, no termination (regardless of cause or procedure) of this Agreement shall in any way affect or impair the power, obligation, duties, rights and liabilities of Seller or SPF relating to (i) any transaction or event occurring prior to such termination, (ii) any Contract existing as of the date of termination of this Agreement, or (iii) any of the undertakings, agreements, covenants, warranties and representations of Seller or SPF with respect to (i) and (ii) above. All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

29. **Rights of Creditors and Third Parties under this Agreement.** This Agreement is entered into between Seller and SPF for the exclusive benefit of Seller and SPF and their respective successors and permitted assigns and is expressly not intended for the benefit of any other party. Except for lenders of SPF which have been granted a security interest in certain accounts, and only to the extent provided by applicable law, no other creditor or third party shall have any rights under this Agreement.

30. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be one Agreement. Signatures transmitted by facsimile shall be considered authentic and binding. In addition, signatures e-mailed in an Adobe Acrobat "Portable Document Format" version of this Agreement or within a "Tagged Image File Format" version of this Agreement shall be considered authentic and binding.

31. **Further Assurances.** Each party agrees to do all acts and things and to make, execute and deliver such written instruments, as may from time to time be reasonably required to carry out the terms and provisions of this Agreement.

32. **Title to Accepted Contracts.** Seller hereby acknowledges and agrees that title to all Accounts (including all Payment Plan Agreements relating thereto and all amounts owing by a Purchaser thereunder) shall at all times be vested in SPF and its assignees, and neither Administrator nor the Seller shall have any right, title or interest therein.

33. **Applicability.** This Agreement shall apply to all Accepted Contracts and all other Contracts financed by SPF prior to or following the execution hereof.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first set forth above.

Vehicle Protection Specialists, LLC
Signature: _____
Print Name: Daniel Laurent
Title: CEO

Address: 6789 Quail Hill Pkwy, Suite 720
Irvine, CA 92603
Phone: 800-881-0824
Fax: 833-667-6234

Signature: _____
Guarantor: Daniel Laurent

SUNPATH FUNDING, LLC
Signature: _____
Print Name: Andrew Garcia
Title: Authorized Signatory

25 Braintree Hill Park, Suite 300
Braintree, MA 02184
Phone: 888-990-7786
Fax: 855-786-7500

Exhibit 12

## POWER OF ATTORNEY

BE IT KNOWN, that Vehicle Protection Specialists, LLC ("Seller"), upon SPF's verifiable receipt and presentation of either (i) VPA attorney's written determination that Seller has ceased all sales activities, or (ii) a determination in writing that Seller has ceased all sales activities from Administrator(s) responsible for at least 50% of the Accepted Contracts sold by Seller during the calendar month immediately preceding the month in which such written notice is provided, has made and appointed, and by these presents does make and appoint, SPF Payment Plans, LLC, a Delaware limited liability company ("SPF"), true and lawful attorney for Seller and in Seller's name, place and stead, for the following specific and limited purposes only:

Communicating with Seller's telephone service providers and/or other Telcom companies (including, without limitation, those providers and/or companies listed below), and signing on behalf of Seller any and all agreements, forms or other documents necessary, to transfer, at Seller's expense, all of Seller's telephone lines to SPF or otherwise in accordance with instructions to be provided by SPF

giving and granting SPF, full power and authority to do and perform all and every act and thing whatsoever necessary to be done in and about the specific and limited premises (set out herein) as fully, to all intents and purposes, as might or could be done if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that SPF shall lawfully do or cause to be done by virtue hereof. Neither SPF nor any of Seller's telephone service providers or Telcom companies shall be liable to Seller or any third party in any way on account of actions taken in reliance on this Power of Attorney. This Power of Attorney is coupled with an interest and will be irrevocable until such time as the Seller Agreement is fully and finally terminated in accordance with the terms set forth therein.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this **4th** day of **March**, 20**16**.

Signed and delivered in the presence of:

Witness: Paul Shaver

Witness: Richard Rodriguez

SELLER: Vehicle Protection Specialists, LLC

By: _____
Print Name: Daniel Laurent
Title: CEO

(To be completed by Seller)

| Name of Each Telcom Company | Contact Information at Telcom Company | Telcom Company Address | Seller's Customer Service Telephone Numbers | Seller's Sales Telephone Numbers |
|---|---|---|---|---|
| VITELITY-ONVO | 888-898-4835 | 317 INVERNESS WAY SOUTH STE 140, ENGLEWOOD, CO 80112 | (800) 881-0804 | (800) 881-0804 |
|  |  |  |  |  |
|  |  |  |  |  |

NOTARY:
STATE OF _____ )
                      ) SS
COUNTY OF _____ )

I, _____, a Notary Public in and for and residing in said County and State, DO HEREBY CERTIFY THAT _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument on behalf of the "Seller", appeared before me this day in person and acknowledged that s/he signed and delivered said instrument as his/her own free and voluntary act for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20___.

**Please See Attached For California Compliant Acknowledgement (CA Civil Code Section 1189)**

_____
Notary Public

My Commission Expires:

Exhibit 17

## CONSENT REGARDING SOFTWARE PROVIDERS

Vehicle Protection Specialists, LLC ("Seller") hereby agrees that (i) SunPath Funding, a Delaware limited liability company ("SPF"), shall be entitled to receive from any CRM Provider (as defined below) any and all reporting information regarding Accepted Contracts which may be in such CRM Provider's possession from time to time, and (ii) each CRM Provider shall be entitled to rely on this Consent, without any further action on the part of Seller and without the need for any further consent from Seller, and no CRM Provider shall be liable in any way on account of providing any information regarding Accepted Contracts to SPF. For purposes of this Consent, "CRM Provider" means Moxy, Forte Data Systems and any other vendor who provides Seller with software or services for customer relations management (including, without limitation sales activities, marketing, customer service, and technical support, or the generation of agreements between customers and Seller).

Agreed and accepted this 4th day of March, 2016.

SELLER: Vehicle Protection Specialists, LLC

By: _____
Print Name: Daniel Laurent
Title: CEO

## TERMS SCHEDULE

This Terms Schedule is attached to and made a part of that certain Seller Agreement dated as of 3/4/2016 by and between SunPath Funding, LLC, a Delaware limited liability company, and Vehicle Protection Specialists, LLC.

**Discount Amount:**

For Programs with direct insurer rated AM Best A- or higher:

| | |
|---|---|
| A term of up to 12 Installment Payments: | 6.5 % of Amount Financed |
| A term of 13 through 15 Installment Payments: | 8 % of Amount Financed |
| A term of 16 through 18 Installment Payments: | 9.5 % of Amount Financed |
| A term of 19 through 24 Installment Payments: | 12 % of Amount Financed |

**Earned Discount Amount on Cancelled Accounts:**

If no funding and no payment, $5 of Discount Amount is earned by SPF.
If cancelled 1 payment collected, 25% of Discount Amount is earned by SPF.
If cancelled 2 payments collected, 35% of Discount Amount is earned by SPF.
If cancelled 3 payments collected, 45% of Discount Amount is earned by SPF.
If cancelled 4 payments collected, 50% of Discount Amount is earned by SPF.
If cancelled 5 payments collected, 60% of Discount Amount is earned by SPF.
If cancelled 6 payments collected, 70% of Discount Amount is earned by SPF.
If cancelled 7 payments collected, 80% of Discount Amount is earned by SPF.
If cancelled 8 payments collected, 90% of Discount Amount is earned by SPF.
If cancelled 9 payments collected, 95% of Discount Amount is earned by SPF.
If cancelled 10 or more payments collected, 100% of Discount Amount is earned by SPF

**Advance Rate:**

| | |
|---|---|
| A term of up to 12 Installment Payments: | 80% |
| A term of 13 through 15 Installment Payments: | 75% |
| A term of 16 through 18 Installment Payments: | 65% |
| A term of 19 through 24 Installment Payments: | 55% |

List any and all Producer Owned Reinsurance Companies (PORC) or Retro Program Agreements:

| PORC/Retro Program Name: | Owner(s): | Administrator(s) |
|---|---|---|
| | (1) | |
| | (2) | |

**Additional Advance Condition and Security Deposit:**

Seller hereby agrees to fund a $0 Security Deposit to be held by SPF, and agrees to fund such Security Deposit as follows: Seller hereby authorizes SPF to holdback $0 from the initial Advance Amount(s) advanced to Seller in accordance with Paragraph 4 of the Seller Agreement. The Security Deposit will be held by SPF until SPF has determined, in its discretion, that Seller has fully, finally and irrevocably satisfied all Seller Obligations to SPF under the Seller Agreement or otherwise, including, without limitation, the payment of all cancellation refunds as described in Section 5 of the Seller Agreement. If at that time any of the Security Deposit remains, it shall be returned
to Seller without interest less any deductions for such unpaid Seller Obligations. SPF shall have discretion in determining the timing and methodology for applying such Security Deposit against unpaid Seller Obligations, and such Security Deposit shall in no way be deemed to restrict SPF from exercising any other rights and/or remedies it may have under the Seller Agreement in respect of Seller Obligations. Seller further agrees and acknowledges that the Security Deposit is unrelated to and separate and distinct from the Reserve referenced in Paragraph 1(M) of the Seller Agreement.

Signed and acknowledged,

Date: 3/4/2016

Signature: _____
Print Name: Daniel Laurence
Title: CEO
Company Name: Vehicle Protection Specialists, LLC

## CALIFORNIA CERTIFICATE OF ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of __Orange__ )

On __4 March 2016__ before me, __Steve Oberlander, Notary Public__,
(here insert name and title of the officer)
personally appeared __Daniel Michael Laurent__
_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature __Steve Oberlander__

STEVE OBERLANDER
COMM. #2114861
Notary Public - California
Orange County
My Comm. Expires June 9, 2019

(Seal)

### Optional Information

Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons relying on the attached document.

**Description of Attached Document**

The preceding Certificate of Acknowledgment is attached to a document titled/for the purpose of __POA — Seller Agreement — Sunpath__
containing __10__ pages, and dated __March 4th 2016__.

The signer(s) capacity or authority is/are as:
- [ ] Individual(s)
- [ ] Attorney-in-Fact
- [ ] Corporate Officer(s) _____
   Title(s)
- [ ] Guardian/Conservator
- [ ] Partner - Limited/General
- [ ] Trustee(s)
- [ ] Other: _____

representing: _____
Name(s) of Person(s) or Entity(ies) Signer is Representing

**Additional Information**

Method of Signer Identification
Proved to me on the basis of satisfactory evidence:
○ form(s) of identification   ○ credible witness(es)

Notarial event is detailed in notary journal on:
Page #_____   Entry #_____

Notary contact: _____
Other
- [ ] Additional Signer(s)   [ ] Signer(s) Thumbprint(s)
- [ ] _____

© Copyright 2007-2015 Notary Rotary, Inc. PO Box 41400, Des Moines, IA 50311-0507. All Rights Reserved. Item Number 101772. Please contact your Authorized Reseller to purchase copies of this form.

## CALIFORNIA CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of __Orange__ )

On __4 March 2016__ before me, __Steve Oberlander, Notary Public__,
(here insert name and title of the officer)

personally appeared __Paul Edward Shaner & Richard Scott Rodriguez__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) ~~is~~/are subscribed to the within instrument and acknowledged to me that ~~he/she~~/they executed the same in ~~his/her~~/their authorized capacity(ies), and that by ~~his/her~~/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature __Steve Oberlander__

(Seal)

STEVE OBERLANDER
COMM. #2114681
Notary Public - California
Orange County
My Comm. Expires June 9, 2019

## Optional Information

Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons relying on the attached document.

### Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a document titled/for the purpose of __POA - Seller Agreement - Sunpath__ containing __10__ pages, and dated __March 4th 2016__.

The signer(s) capacity or authority is/are as:
- ☐ Individual(s)
- ☐ Attorney-in-Fact
- ☐ Corporate Officer(s) _____ Title(s)
- ☐ Guardian/Conservator
- ☐ Partner - Limited/General
- ☐ Trustee(s)
- ☐ Other: _____

representing: _____
Name(s) of Person(s) or Entity(ies) Signer is Representing

### Additional Information

Method of Signer Identification

Proved to me on the basis of satisfactory evidence:
○ form(s) of identification  ○ credible witness(es)

Notarial event is detailed in notary journal on:
Page #  _____   Entry # _____

Notary contact: _____

Other
- ☐ Additional Signer(s)    ☐ Signer(s) Thumbprint(s)
- ☐ _____

© Copyright 2007-2015 Notary Rotary, Inc. PO Box 41400, Des Moines, IA 50311-0507   All Rights Reserved   Item Number 101772   Please contact your Authorized Reseller to purchase copies of this form.

Vehicle Protection Specialists
Summary of Transactions with SunPath Funding
Status as of February 18 2021

| | |
|---|---:|
| Amount Funded for VPS Sales | $ 20,761,751 |
| Adjustments | $56,135 |
| Discount Earned to Date | $2,099,150 |
| Total Amount Finaced/Owed by VPS | $ 22,916,809 |
| | |
| Toatal Collected | $ 20,941,526 |
| | |
| Current Surplus/Deficit | ($1,975,370) |
| All Potential Future Collections | $ 221,721.00 |
| Withheld by SunPath Funding | $ 71,467.56 |
| | |
| Recovered from Insurance surplus | $ 457,078.00 |
| | |
| Balance Due Today (Min Final Deficit) | ($1,225,103) |