UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SUNPATH FUNDING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VEHICLE PROTECTION SPECIALISTS LLC and DANIEL LAURENT a/k/a DANIEL MICHAEL LAURENT,<br><br>Defendants. | Civil Action No. 22-12153-MJJ |

## MEMORANDUM OF DECISION

July 7, 2025

JOUN, D.J.

Plaintiff SunPath Funding, LLC ("SunPath"), brings this action against Defendants Vehicle Protection Specialists LLC ("VPS") and Daniel Laurent a/k/a Daniel Michael Laurent ("Mr. Laurent," collectively, with VPS, "Defendants") for breach of contract against VPS and breach of personal guaranty against Mr. Laurent, seeking a total of $1,253,143.54 in damages, and $4,000 in attorneys' fees. [*See* Doc. No. 1-3 at ¶¶ 7-16]. Specifically, SunPath alleges that VPS defaulted on a Seller Agreement between the parties by failing to pay back SunPath for money that it advanced to VPS pursuant to the Seller Agreement, and that Mr. Laurent violated his obligations to personally guarantee the money that VPS owed.

Before me is Defendants' Motion for Summary Judgment. [Doc. No. 29]. As explained below, SunPath has failed to put forth sufficient evidence of damages to a reasonable certainty. Accordingly, Defendants' Motion for Summary Judgment is GRANTED.

I.   **BACKGROUND**[1]

    A.   <u>**The Seller Agreement and the Parties' Contractual Relationship**</u>

VPS was in the business of selling vehicle service contracts which provide for the payment or reimbursement of costs for the repair and replacement of certain parts in vehicles owned or leased by purchasers of those contracts. [Doc. No. 30 at 8, ¶ 1]. VPS was provided the contracts by a contract administrator pursuant to a written agreement whereby the administrator would provide the contracts at a predetermined cost. [Doc. No. 36 at 8]. VPS was responsible for determining the contract's retail cost which would be charged to consumers and did so by adding its own seller mark-up to the administrator cost. [*Id.*]. VPS's profit margin for each sale was the seller-makeup. [*Id.*].

Pursuant to a Seller Agreement that the parties entered on March 4, 2016, SunPath financed these contracts through payment plans provided to customers. [Doc. No. 30 at 8, ¶ 1]. Under the Seller Agreement, SunPath would "advance" commissions to VPS for each contract sold, called an "Advance Amount" in the Seller Agreement, around or at the inception of each payment plan. [Doc. No. 30 at 8, ¶ 2; Doc. No. 36 at 8]. These advances would be "earned" by consumers making payments over time on their vehicle service contracts. [Doc. No. 30 at 8, ¶ 2]. The Seller Agreement contemplates a Term Schedule by which the parties negotiated the Advance Rate for various installment plans. [Doc. No. 1-3, at 14; Doc. No. 36 at 23]. For example, under the terms of the Seller Agreement, if VPS sold a contract with a term of up to 12 installment payments, VPS would receive an Advance Rate of 80% of the seller mark-up in advance. [*Id.*]. The provision contemplates a 20% Cancellation Rate for such a contract. [Doc. No. 36 at 23]. The Cancellation Rate varies depending on the type of installment plan. [*Id.*].

---

[1] The facts here are undisputed unless otherwise noted.

If a purchaser canceled a vehicle service contract, VPS (and by way of his personal guaranty, Laurent) would become liable for some portion of the unearned Advance Amounts, called in the Seller Agreement the "Cancellation Refund." [Doc. No. 30 at 8, ¶ 3]. The Seller Agreement provided for the establishment of a "Reserve" comprised of unadvanced amounts that were to be applied to anticipated deferred obligations of VPS that arose during the term of the Seller Agreement. [Doc. No. 36 at 8]. The Seller Agreement allocates to VPS and Laurent the risk of loss should a consumer not make payments sufficient to recoup the entire Advance Amount because it cancelled the contract early. [Doc. No. 30 at 8, ¶ 3]. "To secure Seller's full and timely performance of all of the Seller Obligations, including without limitation the full and timely payment of all Cancellation Refunds," VPS granted SunPath "a continuing security interest and first lien" in all of VPS's assets. [Doc. No. 1-3 at 9, ¶ 13; Doc. No. 30 at 8, ¶ 4]. In no instance did the "Advance Amount" of any individual contract sold by VPS and financed by SunPath exceed $5,000. [Doc. No. 30 at 8, ¶ 5].

    **B.**     **Contract Cancellations during the Contract Sales Period**

From March 4, 2016, through September 11, 2019, ("Contract Sales Period"), VPS sold contracts and received Advanced Amounts from Plaintiff. [Doc. No. 36 at 9]. The contracts sold by VPS would often get cancelled by the vehicle owner long before the contract had run. [Doc. No. 30 at 6; Doc. No. 32 at ¶ 5]. Plaintiff asserts that during the Contract Sales Period, the Defendant sold 15,395 contracts, but 12,816 contracts were cancelled – roughly 83% of all Contracts sold.[2] [Doc. No. 36 at 9]. During his deposition, Mr. Laurent testified, when looking at the Spreadsheet, that approximately 83% of contracts sold canceled, but did not testify regarding the accuracy of the spreadsheet. [Doc. No. 36-3 at 67-69].

---

[2] Plaintiff does not allege these numbers in its complaint, otherwise cite its source, or point to anything in the record that supports these contract numbers or cancellations.

Throughout the Contract Sales Period, VPS had access to a Portal that tracked the performance of each payment plan and incorporated data from the customer relationship management ("CRM") software. [Doc. No. 30 at 12, ¶ 28; Doc. No. 36 at 9; 13, at ¶¶ 13-15]. VPS was notified when there was a cancellation. [Doc. No. 36 at 13, ¶ 14; *id.* at 16, ¶ 35; Doc. No. 36-3 at 48-49 (Laurent testified that a VPS staff member would become aware of a cancellation in the finance portal)]. Upon learning that a contract had been canceled, VPS at times would attempt to "call the consumer and tried to get them to pay, and if they still didn't want to pay, they tried to discount the policy (Contract) or maybe extend the term." [Doc. No. 36 at 13, ¶ 16]. Laurent testified that it was to VPS's advantage for customers to stay current on their payments, because "[t]he more the consumer makes the payment, the better, because [VPS has] less liability." [Doc. No. 36 at 15, ¶ 30; *id.* at 16, ¶ 36; Doc. No. 36-3 at 49].

Plaintiff states that "VPS's Contract portfolio had an above average cancellation rate," but its support for this assertion is not in the record. [Doc. No. 36 at 14, ¶ 22].[3] Plaintiff states that because of VPS's above average cancellation rate, Plaintiff elected to modify and reduce the Advance Rate to VPS, and that after providing VPS with revised Advance Rates, VPS elected to discontinue sales of the Contracts entirely—this is also supported by evidence not in the record. [Doc. No. 36 at 14, ¶ 24].[4] Plaintiff further states that "VPS and Laurent were aware that VPS business was 'upside down' as early as September 2019, if not sooner," and cites to the deposition transcript of Scott McMillan, SunPath's 30(b)(6) deponent, [*see* Doc. No. 36 at 14, ¶ 23; *id.* at 17, ¶ 42; Doc. No. 36-4 at 21], but the portion of that transcript does not identify

---

[3] Paragraph 22 of Plaintiff's statement of facts, [Doc. No. 36 at 14, ¶ 22] cites to a deposition transcript from Plaintiff's corporate deponent Andrew Garcia, that Plaintiff states is attached to its Opposition as Exhibit F, although no such deposition transcript is contained in Exhibit F. I note that Defendants have included four pages of different excerpts from Garcia's deposition. [*See* Doc. No. 31 at 172-177 ("Exhibit F" to Chapman Declaration)].

[4] Plaintiff again cites to certain excerpts of the "Garcia Deposition," which is not in the record.

September 2019 as the timeframe and Plaintiff does not explain exactly what the term "upside down" means.[5] Relatedly, Defendants state that "Laurent was repeatedly told by Andrew Garcia of Sunpath in the years 2013 to 2019 that VPS was 'in the green' as regards monies owed to Sunpath. Laurent understood those statements to mean that VPS was earning enough money in commissions to cover the Advance Amounts and that no additional payments were due from VPS to Sunpath." [Doc. No. 30 at 11, ¶ 24; Doc. No. 32 at ¶ 8]. Plaintiff disputes this but does not cite to any portion of the record, other than to generally reference the Garcia deposition and an "email of Joe Abraham referenced in McMillan Deposition." [Doc. No. 36 at 12, ¶ 7].

On January 16, 2020, SunPath sent VPS a demand letter providing notice that VPS was in default of the Seller Agreement in the principal amount of $719,704.35. [Doc. No. 36 at 13-14, ¶¶ 17-20; *see also* Doc. No. 36-2 at 26-27]. During his deposition, Mr. Laurent testified that when he received the demand letter, he did not do anything in response to receipt of the letter or look at the excel spreadsheet that was purportedly attached to the letter. [Doc. No. 36 at 10; Doc. No. 36-3 at 72].[6] While Defendants state that the Seller Agreement between the parties was terminated in June 2019, [Doc. No. 30 at 8, ¶ 6], Plaintiff disputes this and contends that the Agreement was never terminated, but rather, "VPS simply elected to cease doing business with SPF in September of 2019." [Doc. No. 36 at 11, ¶ 3].

C. **The Spreadsheet**

The main piece of evidence at issue in this case is a spreadsheet entitled "VPS Data 02.18.2021" (the "Spreadsheet"). [*See* Doc. No. 31 at 50-150]. The Spreadsheet contains

---

[5] Paragraph 33 of Plaintiff's statement of facts states that "Mr. Garcia confirms in his deposition that VPS's business declined dramatically because its cancellations were 'much worse than average and became even more, you know, upside down as it aged and the business went on so.'" [Doc. No. 36 at 16, ¶ 33]. This portion of Mr. Garcia's deposition is not in the record.

[6] The excel sheet attached to the letter is not in the record.

5

columns for the contract's policy number, effective date, status (i.e., whether it is cancelled), discounts, credits, and other amounts and adjustments. [*Id.*]. The Spreadsheet is approximately 100 pages, contains more than 15,000 rows, and 330,000 individual cells. [*Id.*]. While Plaintiff claims that VPS has had this Spreadsheet in its possession at least as early as June 2, 2023, when it answered Plaintiff's First Set of Interrogatories to VPS, [Doc. No. 36 at 12, ¶ 8; Doc. No. 36-2 at 15], Mr. Laurent submitted a declaration stating that, prior to his deposition on June 12, 2024, he had never seen or received a copy of the Spreadsheet, and he is not aware of the source of the data or what data was used to populate the cells in the Spreadsheet. [Doc. No. 32 at ¶ 9-10; Doc. No. 31 at 22].

On November 28, 2023, Defendants noticed the deposition of a SunPath Rule 30(b)(6) corporate deponent on topics including, "All data, documents, and formulas used in calculating damages." [Doc. No. 30 at 9, ¶ 10]. On December 1, 2023 and February 12, 2024, Defendants took the deposition of Scott McMillan, who was offered as the Rule 30(b)(6) deponent by SunPath on all topics, including the facts supporting breach and the calculation of SunPath's alleged damages. [Doc. No. 30 at 9, ¶ 11; Doc. No. 31 at 155]. Mr. McMillan testified that he had no knowledge of the Spreadsheet and had never seen it before. [Doc. No. 30 at 9, ¶ 12; Doc. No. 31 at 157]. Mr. McMillan was not asked to prepare for his 30(b)(6) deposition to answer the question of what VPS owed to SunPath Funding, and he was not aware of what formulas would be required to make such a calculation. [Doc. No. 30 at 9-10, ¶ 13; Doc. No. 31 at 167]. Mr. McMillan further testified that he could not: (i) answer any specific questions about the source of the information from the spreadsheet; (ii) verify the accuracy of the spreadsheet; (iii) identify how the formulas in the spreadsheet worked or explain the discrepancies in those formulas, "including as regards a number of data points that were 'hard-coded' in the spreadsheet, i.e., absolute values not derived from a calculation or application of a formula;" (iv) verify whether

the spreadsheet was "inclusive of, or reflected, all accounts between VPS and SunPath;" or (v) identify the specific terms in the Seller Agreement that VPS breached and the date on which that purported breach occurred. [Doc. No. 30 at 10, ¶ 15-17; Doc. No. 31 at 158-159, 161-162, 167, 169-170]. Mr. McMillan also did not have any personal knowledge as to the "specific number that VPS and Laurent" owe. [Doc. No. 30 at 10, ¶ 18; Doc. No. 31 at 162].

On March 28, 2024, after Mr. McMillan's deposition and in response to Mr. McMillan's lack of knowledge regarding the spreadsheet, SunPath's counsel suggested that Andrew Garcia, the author of the Spreadsheet, may be able to vouch for the accuracy of the underlying data of the Spreadsheet and might be able to explain how the formulas in the Spreadsheet worked. [Doc. No. 30 at 10, ¶ 19; Doc. No. 31 at 179-181]. On August 28, 2024, Defendants took the deposition of Mr. Garcia. [Doc. No. 30 at 11, ¶ 21; Doc. No. 31 at 172-177]. When asked if the Spreadsheet contained all data needed to calculate the amount owed by VPS to SunPath, Mr. Garcia testified that it did not, and that he was not sure whether that data is available, [Doc. No. 30 at 11, ¶ 22]:

> Q: And so a lot of the data as you mentioned that would be necessary to calculate the amount owed by VPS to Sunpath on each contract that's not contained in this report, in this spreadsheet; correct?
> A: No. That's not what it's meant to do. No. Dan could have looked at this report when it was given to him and he could have verified all this information.
> Q: Can we do that today?
> A: I don't know what Dan has access to today.
> Q: Let me reframe my question. I'm not talking about Dan. I'm talking about Sunpath Funding. Can Sunpath Funding today –
> A: Oh, I'm not sure the data is available somewhere.

[Doc. No. 31 at 174]. Defendants also asked Mr. Garcia where the information in the excel sheet may have come from, and Mr. Garcia testified that the underlying data comes from the CRM software called "Moxie:"

7

> Q: So if we want to go back and check this because we get this as an Excel spreadsheet and we're here, you know, discussing what's owed to Sunpath Funding from VPS and we want to go back and find out where that number came from --
> A: Most of this – all the base information came from Dan
> Q: Where? When you say came from Dan, where is that now? Where would I find that today?
> A: It would be --- all the base data would be in moxie. So he chose the CRM system to use which was called Moxie and so when he would book a contract, all his sales reps would be working in Moxie to find out what the rates were, how much they could mark it up. Dan would set parameters in them or Zach, who worked with Dan, and they would set parameters in there and so all the base data for everything, far more than this meaning the vehicle, the year, all of that information is in Moxie and was provided to us by Moxie.

[Doc. No. 31 at 175-176]. When asked if SunPath still has access to the data in Moxie, Mr. Garcia responded that Moxie is "not the full source of what's in the spreadsheet" and that to his knowledge, SunPath "didn't have access to Moxie. Moxie exported the data to Sunpath Funding." [*Id.* at 177]. When asked where that information went, Mr. Garcia responded: "Moxie would send a file, okay, and so I would assume Moxie would have all those files and to my knowledge they're still in business so they would have sent the file to Sunpath Funding. They would also send the file to Sunpath Administration with all the, you know, the vehicle, the miles, all that type of thing that Dan's guys had collected so Moxie would have all those files as well." [*Id.*]. However, Mr. Garcia did not know what format those files were in. [*Id.*].

## II.   PROCEDURAL HISTORY

On October 5, 2022, SunPath filed suit, asserting claims against VPS and Mr. Laurent for Breach of Contract (Count I), and Breach of Personal Guaranty (Count II). [Doc. No. 1-3]. On November 1, 2024, Defendants filed their Motion for Summary Judgment. [Doc. No. 29]. On November 5, 2024, Defendants filed an accompanying memorandum of law in support of their Motion. [Doc. No. 30]. On November 26, 2024, Plaintiff filed an Opposition. [Doc. No. 36]. On

December 11, 2024, Defendants filed their reply. [Doc. No. 39]. A hearing on the motion was held on January 23, 2025. [Doc. No. 45].

### III. LEGAL STANDARD

"Summary judgment is appropriate when the moving party shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." *Taite v. Bridgewater State Univ., Bd. of Trustees*, 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up). Once a party properly supports a motion for summary judgment, the opposing party "bears the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Lincare*, 989 F.3d at 157 (cleaned up).

In assessing whether a genuine dispute of material fact exists, courts "look to all of the record materials on file, including the pleadings, depositions, and affidavits," while "neither evaluat[ing] the credibility of witnesses nor weigh[ing] the evidence." *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). The record must be examined, however, "in the light most favorable to the nonmovant[,] . . . drawing all reasonable inferences in that party's favor." *Lopez-Hernandez v. Terumo Puerto Rico LLC*, 64 F.4th 22, 28 (1st Cir. 2023). And the Court "proceed[s] with caution and restraint when considering summary judgment motions where, as here, issues of pretext, motive, and intent are in play." *Taite*, 999 F.3d at 93.

### IV. ANALYSIS

#### a. The Spreadsheet is Insufficient to Prove Damages

"A party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty." Restatement (Second) of

Contracts § 352 (1981). "Massachusetts law is clear that lost profits are a recoverable form of damages, so long as they are established with sufficient certainty." *Spring Inv. Servs., Inc. v. Carrington Cap. Mgmt., LLC*, 2013 WL 1703890, at *15 (D. Mass. Apr. 18, 2013). "However, such damages may not be recovered when they are so 'remote, or so uncertain, contingent, or speculative as not to be susceptible of trustworthy proof.'" *Id.* (citing *John Hetherington & Sons, Ltd. v. William Firth Co.,* 210 Mass. 8, 21–22 (1911)). "The party seeking to recover lost profits bears the burden of proving that they are the proximate result of a breach, and that the amount of loss is 'capable of ascertainment by reference to ... established experience or direct inference from known circumstances.'" *Id.* There are numerous deficiencies with the Spreadsheet as the evidentiary basis for Plaintiff's claim seeking approximately $1.2 million in damages.[7]

First, the Spreadsheet is 100 pages long, contains more than 15,000 rows, and 330,000 individual cells. Plaintiff has not provided an expert report or expert testimony that would assist the jury in calculating those damages. The jury would have to navigate this complex set of data without any aid and "would have to speculate in order to determine the level of damages." *Allens Mfg. Co. v. Napco, Inc.*, 3 F.3d 502, 505 (1st Cir. 1993). While damages are not speculative where a jury is provided with a "formula" for ascertaining loss, *Bala v. AOTec, Inc.*, 1998 WL 1181261, at *1 (Mass. Super. July 8, 1998), Plaintiff has not put forth any formula that a jury could utilize, especially where Plaintiff has not put forth in the record evidence of the source of the data underlying the Spreadsheet or evidence affirming the accuracy of the Spreadsheet. Indeed, Plaintiff concedes that neither SunPath nor VPS and Laurent currently have access to the underlying data, even though they once might have. [Doc. No. 45; Mot. H'rg Draft Tr.

---

[7] As explained further below, I do not find that Plaintiff's vague references to "additional evidence" it intends to offer at trial is sufficient to address whether it has established damages to a reasonable certainty such that Plaintiff can defeat summary judgment.

01/23/2025 at 34-35 ("Q: you don't have whatever underlying data that was available some years ago when the spreadsheet was made? Right now all you have is the spreadsheet and you will be able to, through testimony and other documents, explain to a jury where these numbers had come from? A: Yes, your honor")]. Further, and more significantly, both of Plaintiff's Rule 30(b)(6) deponents were unable to testify to the accuracy of the Spreadsheet as a measure of Plaintiff's damages.

Plaintiff's first 30(b)(6) deponent, Mr. McMillan, testified that he had no knowledge of the spreadsheet, had never seen it before his deposition, and could not: (i) answer questions about the source of the information from the spreadsheet; (ii) verify the accuracy of the spreadsheet; (iii) identify how the formulas in the spreadsheet worked or explain the discrepancies in those formulas; (iv) verify whether the spreadsheet was "inclusive of, or reflected, all accounts between VPS and SunPath;" or (v) identify the specific terms in the Seller Agreement that VPS breached and the date on which that purported breach occurred. [Doc. No. 30 at 10, ¶¶ 13, 15-17]. Mr. McMillan also did not have any personal knowledge as to the "specific number" that VPS and Laurent owe. [Doc. No. 30 at 10, ¶ 18; Doc. No. 31 at 162].

Plaintiff even had a second bite at the apple by offering the testimony of Mr. Garcia, the author of the Spreadsheet. Mr. Garcia testified that the Spreadsheet was not meant to calculate the amount of money owed by VPS to SunPath, that the Spreadsheet did not have all data needed to calculate the amount owed by VPS to SunPath, and that he was not sure whether the data was available anywhere. [Doc. No. 30 at 11, ¶ 22; Doc. No. 31 at 174]. While Mr. Garcia did testify that the underlying data comes from the Moxie customer relations software that both parties utilized, he also testified that Moxie "is not the full source of what's in the spreadsheet" and that to his knowledge, SunPath "didn't have access to Moxie. Moxie exported the data to SunPath Funding." [Doc. No. 31 at 175-177]. This unrebutted testimony shows that the Spreadsheet itself

11

is incapable of establishing damages and lacks the necessary foundation and reliability that the jury needs to calculate those damages.[8]

Plaintiff argues that there is a formula contained in the Seller Agreement that would permit the jury to calculate its losses. Plaintiff explains that one could look to the Seller Agreement's definitions of "Advance Amount," "Advance Rate," "Reserve," "Unadvanced Amount," and "Seller Obligations" as well as the "Term Schedule." [Doc. No. 36 at 23]. The Term Schedule explains how the Advance Amount percentage varies depending on the term of the installment payment plan, and that the cancellation rates also vary depending on the type of payment plan. Plaintiff explains that the Seller Agreement and "other business records," as well as witness testimony, will help explain how the formula worked in practice and how that formula, "coupled with the information obtained from VPS's CRM Software" prove damages. [*Id.* at 21]. Plaintiff still does not explain how the "formula" in the Seller Agreement can be applied to the data in the Spreadsheet or how that data can be used to calculate damages. As explained below, any anticipated or forthcoming evidence at trial is insufficient to establish the existence of such a formula now. Further, even assuming the Seller Agreement constitutes a "formula," without the underlying data to plug into the formula, a jury cannot calculate damages.

## b. **Plaintiff Cannot Rely on Evidence at Trial to Defeat Summary Judgment**

Under Massachusetts law, it is *plaintiff's* burden to establish that there was a breach of contract and that "the plaintiff sustained damages as a result of the breach." *Power v.*

---

[8] Contrary to Plaintiff's assertions, Defendants do not mischaracterize or "cherry-pick" Mr. Garcia's deposition testimony. First, the testimony Plaintiff relies on is not in the record. Second, to the extent that this testimony would show that the Spreadsheet contains "all of the data necessary to calculate surplus or deficit" at "the transactional level," that still does not cure the defects in the Spreadsheet or otherwise enable a jury to calculate damages from the Spreadsheet. [Doc. No. 36 at 22; *id.* at 15, ¶ 27]. Similarly, and as explained further below, Mr. Garcia's purported testimony that Mr. Laurent could verify the total amount owed if he had access to the Moxie system does not cure the Spreadsheet's defects because neither party currently has access to the Moxie, and, in any event, it is not his burden to prove damages.

*Connectweb Techs., Inc.*, 740 F. Supp. 3d 39, 55 (D. Mass. 2024) (citation omitted). While the party moving for summary judgment "bears the initial burden of demonstrating the lack of evidence to support the nonmoving party's case" . . . "on issues where the nonmovant *bears the ultimate burden of proof*, he must present definite, competent evidence to rebut the motion." *Calderon Amezquita v. Rivera-Cruz*, 483 F. Supp. 3d 89, 101-102 (D.P.R. 2020) (cleaned up) (emphasis in original). Here, it is SunPath's ultimate burden to prove damages to a reasonable certainty. Plaintiff argues that it will prove its damages at trial. This does not diminish Plaintiff's responsibility to present "definite, competent evidence" to rebut Defendants' summary judgment motion here. *Id.*

Plaintiff argues that it will prove damages "through a combination of evidence, including Defendants' admissions during discovery, the executed Seller Agreement, a demand letter, data that is inclusive of data from VPS's CRM software (incorporated into the Portal), and corroborating evidence and testimony from Plaintiff's former employees," and that its witnesses will testify regarding the data's origin and the CRM, the data's use by both parties in calculating amounts due, and "the corroboration between the VPS Data spreadsheet and Portal." [Doc. No. 36 at 18].[9] Plaintiff "intends to offer additional evidence, including impeachment evidence, at trial to corroborate and support that which Defendants admit they have been previously provided. That evidence includes, but is not limited to, the Seller Agreement and the exhibits appended thereto, email correspondence between the parties which demonstrate the parties' mutual access to and reliance upon the data at issue, various reports and a demand letter, and testimony from Plaintiff's former employees." [*Id.* at 21-22].

---

[9] Some of this evidence referenced—the Spreadsheet, the demand letter, and Defendants' admissions during discovery—are already in the record.

"A court is not obliged to deny an otherwise persuasive motion for summary judgment on the basis of a vague supposition that something might turn up at the trial." *Soar v. Nat'l Football League Players' Ass'n*, 550 F.2d 1287, 1289 n.4 (1st Cir. 1977) (citation omitted); *Taylor v. Gallagher*, 737 F.2d 134, 137 (1st Cir. 1984) (nonmovant "may not create the possibility of conflicting inferences through wishful thinking"). Plaintiff's "vague references to 'evidence' that [it] would present on trial fall well short of the standard required by this and other courts to establish the presence of the genuine issue of material fact." *White v. Burke Ctr.*, 516 F. App'x 392, 393 (5th Cir. 2013). Here, Plaintiff does not explain what its additional evidence is, what "various reports" are, and why any of this evidence cannot be used now to defeat summary judgment. For instance, Plaintiff has not explained why it did not earlier depose witnesses who it claims can testify to the underlying data of the Spreadsheet or otherwise corroborate it, why it did not submit "email correspondence" to the record, and why it did not obtain an expert who could assist the jury with calculating damages. Plaintiff leaves too much to speculation, and its arguments that it will present evidence at trial is not sufficient to defeat summary judgment now.[10] Because Plaintiff is not entitled to trial "on the basis of a hope that he can produce some

---

[10] Plaintiff's contention that it will present impeachment evidence at trial is insufficient to defeat summary judgment. Plaintiff "must demonstrate that he has substantive evidence to make a prima facie case to defeat the motion for summary judgment, and he cannot rely on the possibility of impeachment evidence to demonstrate that there is a dispute of material fact." *Kendall v. Bausch & Lomb, Inc.*, 2009 WL 1740008, at *7 (D.S.D. June 17, 2009); *Progressive Cas. Ins. Co. v. Monaco*, 2017 WL 2873051, at *8 (D. Conn. July 5, 2017) ("Evidence that could be admitted at trial only for impeachment purposes cannot itself be used to support a party's case at the summary judgment stage") (cleaned up). Further, Plaintiff argues that it will enter into evidence certain "banking records evidencing weekly payments to VPS and records recently obtained from PayLab which further confirm and corroborate the Plaintiff's business records" as impeachment evidence. [Doc. No. 36 at 21]. Defendants aver that these documents were served approximately ten minutes prior to when Plaintiff filed its opposition, and contains "approximately 320 new documents, including several Excel spreadsheets that are hundreds of pages long and include tens of thousands of cells." [Doc. No. 39 at 7]. Plaintiff admits that it does not rely on this evidence for summary judgment, and therefore, I will not consider it. [Doc. No. 45; Mot. H'rg Draft Tr. 01/23/2025 at 26-27].

evidence at that time," I can only rely on the evidence Plaintiff has put forth on the record currently.[11] 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2727.2 (4th ed. 2018). As such, summary judgment is granted in favor of Defendants on all counts.[12]

## V.     CONCLUSION

For the reasons above, Defendant's Motion for Summary Judgment, [Doc. No. 29], is GRANTED.[13]

SO ORDERED.

/s/ Myong J. Joun
United States District Judge

---

[11] Plaintiff's argument that I should deny summary judgment because Defendants had "equal access to the data and could verify it" is unpersuasive. [Doc. No. 36 at 23]. First, it is *Plaintiff's* burden to prove damages to a reasonable certainty. *See Allens*, 3 F.3d at 505 (affirming trial judge's finding that plaintiff did not identify damages with a reasonable certainty because the jury "would have to speculate in order to determine the level of damages"). Second, SunPath admits that neither party has the underlying data that was available at the time that the Spreadsheet was made such that Defendants could even conduct their own calculations. [Doc. No. 45; Mot. H'rg Draft Tr. 01/23/2025 at 31-35].

[12] To the extent that Plaintiff's breach of personal guaranty claim is premised on Mr. Laurent's signature on the Seller Agreement as guarantor, [*see* Doc. No. 1-3 at 3, ¶¶ 14-16; *id.* at 11], and breach of that guaranty, summary judgment is also granted in favor Defendants as damages are not calculable to a reasonable certainty.

[13] I decline to reach Defendants' remaining arguments that the Seller Agreement is void *ab initio* premised on the theory that SunPath is an unlicensed lender under California Financing Law. [*See* Doc. No. 30 at 18-23]. Relatedly, I DENY Plaintiff's procedurally improper requests for Rule 11 Sanctions, claim for breach of good faith and fair dealing, and motion to strike/motion in limine raised for the first time in its Opposition and brought in response to Defendants' arguments regarding whether the Seller Agreement is void. [*See* Doc. No. 36 at 29-39].